AES:LHE
F. #2019R01548

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

NANCY JEAN and
CARISSA SCOTT,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. 20-MJ-16

**To Be Filed Under Seal**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST WARRANTS

(18 U.S.C. § 1349)

EASTERN DISTRICT OF NEW YORK, SS:

ARISTOTELIS KOUGEMITROS, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), duly appointed according to law and acting as such.

Upon information and belief, in or about and between September 2019 and January 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants NANCY JEAN and CARISSA SCOTT (referred to hereinafter, collectively, as "the defendants"), together with others, did knowingly and intentionally conspire to execute a scheme and artifice to defraud investors in concerts, including but not limited to a concert scheduled for the benefit of the Sandy Hook Promise Foundation at the Alamodome in San Antonio, Texas, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted, by means of wire

communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349)

The source of your deponent's information and the grounds for his belief are as follows:

## **INTRODUCTION**

1. I have been employed as a Special Agent with the FBI for approximately nine years. During my tenure with the FBI, I have participated in numerous financial fraud investigations and have participated in all aspects of such investigations, including conducting surveillance, executing search warrants, debriefing defendants and informants, interviewing witnesses, reviewing and analyzing recorded conversations, and analyzing telephone toll information. I have personally participated in the investigation of the fraudulent activity described below. I am familiar with the facts and circumstances set forth below from: (a) my participation in the investigation; (b) my review of the case file and reports of other law enforcement officers involved in the investigation; and (c) bank records, email and telephone communications, and other sources of information.

2. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from other law enforcement agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendants, I have not set forth each and every fact learned in the course of this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrants sought herein. In addition, where the contents of documents, or the actions, statements and conversations of others are

reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

## PROBABLE CAUSE

### A. The Defendants and Their Business

3. The defendant NANCY JEAN was a resident of Georgia and a Music Promoter, Booking Agent and Road Manager at Canvas Media Group.

4. The defendant CARISSA SCOTT was a resident of Mississippi and an Event Coordinator, Booking Agent, Account Executive and Media Specialist at Canvas Media Group.

5. Canvas Media Group ("Canvas Media") was, according to its website, a marketing and promotions business based in Atlanta, Georgia, that also provided services booking musical acts for concerts and events.

### B. The Fraudulent Scheme

6. Based on the information set forth below, I believe that the defendants NANCY JEAN and CARISSA SCOTT executed a scheme to defraud investors in a concert by falsely claiming to act as booking agents for a number of famous musicians, including Justin Timberlake and Bruno Mars, when, in fact, the defendants were not affiliated with those musicians and had not spoken with representatives for those musicians. In connection with the scheme, the defendants solicited hundreds of thousands of dollars from victims, based on false statements that that the funds would be paid to the musicians in exchange for the musicians' performance at concerts. Instead, the defendants failed to pay the musicians as they had promised, and either retained the victims' funds for themselves and/or misappropriated those funds..

7.     I have interviewed an individual ("Individual #1") who attempted to retain the services of Canvas Media to secure musicians to perform at an event.[1]  Individual #1 told me, in sum and substance and in part, that in or about September 2019, he was introduced to the defendant CARISSA SCOTT through a mutual contact.  Individual #1 was coordinating a concert in the area of San Antonio, Texas, which was designed to raise money for the Sandy Hook Promise Foundation (the "Sandy Hook Benefit Concert") and also to generate profits for Individual #1 and other investors.  The Sandy Hook Promise Foundation is a charitable organization founded by families of victims of the Sandy Hook shooting, and is devoted to providing programs and practices to protect children from gun violence.  SCOTT advised Individual #1 that she had the ability to book top-tier musical acts, such as Bruno Mars, Justin Timberlake, Lady Gaga, Usher and others to perform at the Sandy Hook Benefit Concert.

8.     As Individual #1's plans progressed, Individual #1 decided to hold the benefit concert at the Alamodome in San Antonio, Texas, on December 13, 2019.  Individual #1 asked the defendant CARISSA SCOTT to book Justin Timberlake, the famous pop musician, to perform at the venue.  Via telephone conversations and text messages, a number of which I have reviewed, SCOTT informed Individual #1 that Timberlake had agreed to perform at the benefit concert.  SCOTT continued to discuss with Individual #1 various aspects of her alleged negotiations with Timberlake, including his preferences for staging and travel arrangements.  For example, in text messages sent to Individual #1, SCOTT specified that one of Timberlake's music producers, known as Timbaland, would be joining him for the performance, and that Timberlake would require a private aircraft to travel to the venue.

---

[1]     Unless otherwise stated herein, all information and statements herein attributed to Individual #1 are set forth in sum and substance and in part.

9. On or around October 22, 2019, the defendant CARISSA SCOTT forwarded an email from the defendant NANCY JEAN to Individual #1 which attached a contract purportedly securing Timberlake's appearance at the Sandy Hook Benefit Concert. This contract stated that Timberlake would perform at the benefit concert on December 13, 2019, in exchange for a fee of $500,000. The contract further stated that Individual #1 would make an initial deposit before the concert of $275,000, and that Timberlake would post about the event on social media. The contract specified that the deposit should be wire transferred to a bank account at Wells Fargo, N.A. held jointly in the name of Canvas Media and JEAN (the "Wells Fargo Account"). On or about October 30, 2019, SCOTT forwarded another email from JEAN attaching a revised contract, which contained the same key terms regarding Timberlake's purported fee, the deposit and the date of the concert.

10. On or about October 31, 2019, at the direction of the defendant CARISSA SCOTT, Individual #1 arranged to have a fellow investor in the Sandy Hook Benefit Concert send a wire transfer to the Wells Fargo Account in the amount of $100,000. These funds purportedly constituted a partial deposit for Timberlake's performance. In response to the transfer, SCOTT claimed via text message that she would arrange for Timberlake to make a social media post about the Sandy Hook Benefit Concert, and requested that Individual #1 supply a script for the post. However, Timberlake never made such a post on any of his social media accounts.

11. Individual #1 subsequently asked the defendant CARISSA SCOTT why Timberlake had not posted about the Sandy Hook Benefit Concert on his social media accounts. In response, SCOTT told Individual #1, via text message, that Timberlake was reluctant to post because he had not yet received the full $250,000 deposit. When Individual #1 complained,

SCOTT shifted gears and advised Individual #1, again via text message, that she would try to negotiate for Bruno Mars, another famous pop musician, to be the headlining act. Specifically SCOTT advised that Mars would perform for a fee of $600,000. On November 8, 2019, SCOTT forwarded to Individual #1 an email from the defendant NANCY JEAN, which attached an agreement purportedly between Mars and Individual #1 stating that Mars would perform at the Sandy Hook Benefit Concert in exchange for a $600,000 payment. The agreement also required a $300,000 deposit.

        12. On or about November 12, 2019, Individual #1 called SCOTT to complain about Timberlake's failure to post about the Sandy Hook Benefit Concert on social media, and to request more proof that Timberlake had committed to the concert. SCOTT told Individual #1 that she would arrange for Timberlake's manager ("Timberlake Manager #1"), to return his call. Approximately two hours after this call, Individual #1 received a call from an unidentified male ("UM") who claimed to be Timberlake Manager #1. During the call, UM stated that Timberlake would perform at the Sandy Hook Benefit Concert, but that the original value of the contract was too low, and that the fee would have to be raised to between $800,000 and $1,000,000.

        13. I have reviewed records relating to the telephone number that dialed Individual #1 during the phone call between Individual #1 and UM described above. I have determined the number to be associated with a Magic Jack Voice-Over-IP account, which allows users to make telephone calls over the internet (the "Magic Jack phone"). The Magic Jack phone is jointly registered to the defendant NANCY JEAN and Canvas Media.

        14. I have also reviewed telephone records for the individual mobile telephones used by Individual #1 and the defendants NANCY JEAN and CARISSA SCOTT.

Those records reflect that at approximately 8:36 p.m. on November 12, 2019, the date of the call between Individual #1 and UM, the Magic Jack phone dialed Individual #1 but got no answer. One minute later, at approximately 8:37 p.m., JEAN sent two text messages to SCOTT. At approximately 8:37 p.m. Individual #1 called the Magic Jack phone, but there was no answer. Then, at 8:45 p.m., SCOTT and JEAN exchanged approximately six text messages. At approximately 8:48 p.m., SCOTT sent a text message to Individual #1 that read "he called you, you didn't answer." At approximately 9:01 p.m., Individual #1 called the Magic Jack phone and participated in a 14-minute phone call, ending at approximately 9:15 p.m. Between 9:02 p.m. and 9:14 p.m., SCOTT and JEAN exchanged eleven text messages. Then, approximately thirty seconds after the end of the call between Individual #1 and the Magic jack phone, JEAN called SCOTT, and the call lasted 12 minutes.

15. After the November 12, 2019 phone call between Individual #1 and UM, Individual #1 introduced an FBI Special Agent, working in an undercover capacity ("UC #1"), to the defendants NANCY JEAN and CARISSA SCOTT as a potential additional investor in the Sandy Hook Benefit Concert. During a recorded conversation on November 25, 2019, UC #1, while located in the Eastern District of New York, spoke with SCOTT and JEAN. On that call, UC #1 represented himself to be a Brooklyn, New York-based financier looking for the opportunity to invest in concerts, including the Sandy Hook Benefit Concert. During this conversation, UC#1 asked for an update on SCOTT's and JEAN's efforts to book Timberlake for the Sandy Hook Benefit Concert. SCOTT responded that Timberlake and Mars were frustrated and worried the concert was a joke, and had demanded full deposits before making any posts on social media. SCOTT then stated that she could arrange for other top-tier artists to perform at the concert, including Drake, Flo Rida and Ed Sheeran, and stated that Timberlake was not "out"

but "wants to know its for real." UC #1 asked whether the deposit money was segregated and used just for the artists, and SCOTT stated that it was. UC #1 also asked whether any money UC #1 would send towards the deposit should be sent to JEAN's account, and SCOTT and JEAN both confirmed that it should be.

16. UC #1 held another conference call with the defendants NANCY JEAN and CARISSA SCOTT on December 3, 2019. During this conversation, UC #1 discussed delaying the Sandy Hook Benefit Concert, and asked that SCOTT and JEAN focus their attentions on booking Timberlake or Mars for a date in March 2020. In response, JEAN advised UC #1 that "if we want to move forward with whomever we choose to move forward, we need to have that deposit up front," and SCOTT added that they meant "the full deposit." UC #1 then asked JEAN and SCOTT to clarify how they were compensated for booking the artists, and SCOTT stated that they made money "on the back end" from profits, but also via a ten percent booking fee.

17. I have reviewed bank records for the Wells Fargo Account, which reflect the incoming $100,000 transfer from Individual #1's co-investor on October 31, 2019. Upon receipt of those funds, the account had a balance of approximately $100,250.16. The records do not reflect payments out to any party or company I know to be associated with Timberlake, Mars or their respective agencies and management companies. Instead, in the 30 days following the deposit, the records show an approximately $4,000 payment to lease a Mercedes-Benz; more than $8,700 in cash withdrawals; an approximately $6,000 payment via a cash app to an individual identified as "Carissa"; and an approximately $1,203 payment to a Saks Fifth Avenue store. There are no other deposits into the account during the 30 days following the $100,000

transfer, aside from what appear to be reversals of payments and charges made during that same period, such as what appears to be processing of returns of merchandise.

        18.    I have interviewed Timberlake Manager #1, who informed me, in sum and substance and in part, that he had never heard of any concert in San Antonio, Texas, on December 13, 2019, and further advised that Timberlake is unavailable to perform at an event on that date. Timberlake Manager #1 also informed me, in sum and substance and in part that he had never spoken to anyone from a company called Canvas Media and did not know or recall ever speaking with the defendants NANCY JEAN or CARISSA SCOTT.

        19.    I have also interviewed a representative from a major talent agency who represents Bruno Mars and Usher ("Mars Agent #1"). Another agent at that agency also represents Timberlake. Mars Agent #1 informed me, in sum and substance and in part, that Mars, Usher and Timberlake were never booked to perform at the Sandy Hook Benefit Concert, and that there would be no way for any of those individuals to have been booked for an event without his knowledge. Mars Agent #1 also informed me, in sum and substance and in part, that he was not familiar with the defendants NANCY JEAN or CARISSA SCOTT.

WHEREFORE, your deponent respectfully requests that the defendants NANCY JEAN and CARISSA SCOTT be dealt with according to law.

_____
ARISTOTELIS KOUGEMITROS
Special Agent, Federal Bureau of Investigation

Sworn to before me this
7th day of January, 2020

_____
THE HONORABLE SANKET J. BULSARA
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK